## Commonwealth v. Levin

**56**

*Colbert C. McClain,* assistant district attorney, for Commonwealth.

*James Dessen* and *T. D. McBride,* for defendant.

GORDON, JR., P. J., ALESSANDRONI and FLOOD, JJ., March 17, 1949.—This case is before us on a plea of guilty to an indictment charging murder, and under our murder statute (section 701 of The Penal Code of June 24, 1939, P. L. 872) it now becomes our duty "to determine the degree of the crime and to give sentence accordingly".

It will serve no useful purpose at this time to recite the sordid and revolting details of the murder to which this defendant has pleaded guilty. They are a part of the public record of the case, and are open to all who have a right and interest to inspect them. It will be sufficient to state that, on the afternoon of January 8, 1949, this defendant, Seymour Levin, a young man just 16 days short of 17 years of age, knowing that the members of his family were absent, enticed into his home 12-year-old Ellis Simons, a stranger to him, and there committed upon that child an act of perverted sexual lust which an examination of the physical remains of the child incontrovertibly established. Having accomplished his unnatural purpose, defendant proceeded to kill his victim by beating, cutting and stabbing him more than 50 times with a pair of scissors and a bread knife, after which he bound and trussed up the body, dragged it through and out of the house,

and in a fatuous attempt to secretly dispose of the remains, deposited them behind a garage located on the property. He then sought to remove from the walls and floors of the house, the bloody proofs of what he had done. After this, he went to his grandmother's house, brought his younger brother home, and enlisted the latter's aid in an effort to further obliterate the remaining bloodstains upon the lying representation that they had been caused by an explosion of chemicals he had been using in an experiment. This falsehood, for the moment, successfully deceived his brother, and he employed the same falsehood in explaining to his parents the presence of the stains he had been unable to remove, when they returned later that night from Toms River, in New Jersey, where they had gone to attend to a business they conducted there. On the following day the body was discovered, and the crime came to light. The evidence overwhelmingly disclosing these broad and basic facts of the case is before us in all its sickening particulars, and fully confirms his plea of guilty.

This brings us to the determination of the degree of the murder, and requires special reference to some of the evidence bearing upon that question. Before discussing this evidence in detail, it should be stated that, in considering, in conjunction with all the other evidence in the case, the testimony of defendant, who is the only witness in his own behalf, we reached the inescapable conclusion that his testimony as to the facts of the murder, and the course of events leading up to and following it, has been of no help to us whatever, since it comes from an individual whose word, whether sworn or unsworn, is utterly unreliable. This is evident, not only from all his conduct and utterances after the crime was discovered, but also from the consensus of opinion of every disinterested person, lay and professional, who testified before us, and who had occasion to appraise his acts and character from the time

he was six years old. The authorities of the public school he attended, who early recognized the behaviour problems which he manifested, and its psychiatrists who examined him, all bear witness to his want of veracity. The same is true of the officials of the Municipal Court, who had him in charge, and its medical experts. So also his demeanor upon the witness stand, and the repeated self-contradictions and transparent absurdities with which his testimony abounds, reveal him to be an unhesitating and deliberate, but stupid, falsifier whenever he thinks the truth would hurt, or a lie help, him. Only when he is corroborated by other credible witnesses, or when it is of no importance to himself whether he speaks truly or falsely can one venture to place a small measure of reliance upon his word. Hence, his denials of having committed an unnatural sexual act upon the child, of having procured from the kitchen of his home the knife he used in the killing, and his claim to having suffered a sudden "blackout", or "unawareness" of what he was doing, which lasted only during the period of the actual killing, cannot be given serious credence.

On the other hand, there is no direct and positive testimony disclosing the exact reason why, having vented his lust upon his victim, defendant then proceeded to kill him. The presence of the injuries on both the front and back of the body negative the argument of counsel that they may have been inflicted in a blind sexual frenzy during the commission of the perverted act. His history of previous acts of cruelty, such as striking and bullying other younger children, falls far short of the picture presented by one afflicted with hemothymia, a well recognized and rare form of lunacy that is characterized by an irresistible sadistic impulse to torture or kill. Such a frenzy is one of the indicia of the insane, not of the psychopath, which the medical experts find this defendant to be. When the murder was committed, defendant's unnatural passion

had been satisfied, the heat of sexual emotion was spent, and the activating reason for the murder must be sought elsewhere. The fairly proved circumstances of this tragedy point preponderately to the conclusion that it was motivated by fear that his unfortunate victim would expose the degrading treatment to which he had just been subjected.

That defendant possesses a psychopathic personality, according to the eminent and able psychiatrists who appeared before us, is of little, if any, importance in determining the degree of this crime. The nature and extent of his particular deviation from the normal in character and behaviour in no way compels the conclusion that he was thereby rendered incapable of forming the deliberate intention to kill Simons that is the criterion of murder in the first degree, or of desisting from his efforts to that end at any moment he might have considered it desirable or advantageous to himself to do so. Whether, therefore, we view him as a normal, but selfish and ruthless youth, or as a so-called "constitutional psychopathic inferior", his crime would, in either case, be a wilful, deliberate and premeditated murder.

We have no thought that defendant lured young Simons to his home for the purpose of killing him, and it may be conceded that the idea of doing so probably did not occur to him until the criminally sexual act was committed. For this reason the period of time that elapsed between the first thought of killing and the accomplishment of the deed was necessarily short, and in this sense, it was a somewhat impulsive, rather than a long and coldly planned, murder. Nevertheless, there was undoubtedly sufficient time for defendant to form the specific intent to kill, and to procure the means of carrying out his evil design. In Commonwealth v. Drum, 58 Pa. 1, Justice Agnew correctly stated the settled law, when he charged the jury that: " 'It is equally true both in fact and from experience, that

*no* time is too short for a wicked man to frame in his mind his scheme of murder, and to contrive the means of accomplishing it' ", and that "He who takes the life of another with a deadly weapon, and with a manifest design *thus* to use it upon him (i.e. to use it upon a vital part of the body), with sufficient time to deliberate, and fully to form the conscious purpose of killing, and without any sufficient reason or cause of extenuation, is guilty of murder in the first degree". The facts that defendant used two deadly weapons, inflicting more than 50 wounds upon the body of Simons, at least three of which were described as serious, and one other as rapidly fatal, having been delivered from behind and going completely through the body severing the aorta, and also that the body bore other evidences of physical brutality, are sufficient to establish that the fully formed intent to kill existed. The ferocity of the assault only indicates defendant's inflexible determination to make certain of the child's death. Sudden and impulsive murders more frequently exhibit a savagery suggestive of emotional tension than those that are longer planned and more coldly executed. So, also, the fact that the knife came from the kitchen, whereas the murder was committed in a bathroom on the second floor, is a circumstance that points to the deliberate character of the killing. The insinuation in defendant's explanation of the presence of the knife in the bathroom to the effect that Simons, on this initial visit to that home, had filched it from a kitchen drawer and taken it with him upstairs for some sinister and undisclosed purpose, because defendant claims to have seen one like it in the child's hand just before the latter started to undress for the so-called physical examination, is inherently unbelievable. In addition, the fact that it rests upon defendant's uncorroborated and selfserving statement strengthens the inference that he procured it himself. Although many other details

of the evidence support the same conclusion, we think sufficient has been noted to justify our finding that, while this murder may have been quickly conceived and impulsively executed, it was clearly a wilful, deliberate, and premeditated murder of the first degree, and we so adjudge it.

This leaves for our determination only the penalty to be imposed, and requires special consideration of certain factors pertinent to that question which we have so far merely noted in passing. Our murder statute, supra, provides that:

"Whoever is convicted of the crime of murder of the first degree . . . shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict. . . . In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life."

Thus the legislature, in committing to the court or jury a broad and absolute discretion to decide the penalty, has carefully refrained from laying down any rules to restrict the free exercise of that discretion. This is as it should be, and in cases of murder of the first degree there is a special reason for the legislature's omission to classify them upon the basis of the penalty to be imposed, which is apparent. The solemn and awesome choice between life and death could not fairly or safely be committed to any man, or body of men, upon any other terms. Otherwise it would not be choice at all. It must be left wholly to the conscience and unfettered judgment of the tribunal charged with the responsibility of deciding whether in the public interest, and in the light of the facts of the particular case before it, the crime merits the supreme penalty of death. As was observed by Mr. Justice Horace Stern, when he was sitting in this court as

early as 1930 in the case of Commonwealth v. Ritter, 13 D. & C. 285:

"It must be assumed that the discretion given by the Act is to be exercised by the jury or by the court, as the case may be, on some rational basis, and not in an arbitrary, capricious or whimsical manner. The law, however, furnishes no precedents upon which any theory of determination of the question is to be sought. Indeed, it is obvious that the problem is not one of law at all, but only of penology."

Not being a question of law, it should be borne carefully in mind that such opinions setting forth the reasons in those cases for imposing one or the other sentence must not be considered as precedents building up and establishing legal and binding rules for determining sentences in later cases. If they were so considered, they would soon defeat the very purpose which the legislature obviously had in mind in refraining from prescribing such rules, would encroach upon the province of the law-making branch of our government, and would work an unwarranted judicial amendment of the provisions of the murder act. Such opinions, however, are of value in indicating the views of experienced and thoughtful judges as to at least some of the elements properly entering into a decision between life and death. Their persuasive force lies in the experience, sagacity and learning of their authors, and the inherent strength of the reasoning they contain. Because of the fundamental character of such opinions, and of the very nature of the problem presented in fixing penalties, a court is not called upon to state, and we think generally would do well to refrain from recording, in detail its reasons for the sentence it imposes in each case. In the present instance, however, the unusual and shocking circumstances of the murder have naturally and properly produced such widespread community interest in the final disposition of the case that

we deem it our public duty to candidly state our reasons for the conclusion to which we have come.

The reported opinions dealing with the question of penalty are, naturally, few in number, one of the earliest being the Ritter case, referred to above. Although written almost 20 years ago, it is still recognized as one of the "leading cases" upon this question, because it deals with the subject comprehensively and philosophically, and is the product of the pen of a jurist renowned and respected for his wisdom, his profound and intelligent insight into human nature and his broad humanitarian outlook. Although honest minds may differ with some of his conclusions, the opinion is well worth the study of those who have similar responsibilities to discharge. In it Justice Stern enumerates four elements to be considered by courts and juries in imposing penalties for crime: (1) To bring about the reformation of the evil doer; (2) to effect retribution or revenge upon him; (3) to restrain him physically so as to make it impossible for him to commit further crimes; (4) to deter others from similarly violating the law: to which we would add another element to be taken into consideration that we will refer to later.

These elements are not all inclusive, and others come into play in particular instances. But they are generally conceded to embrace the principal tenets of modern and enlightened penology, and their relative importance to the determination of proper punishment varies with the circumstances of each case. Thus the first of them, namely, "to bring about the reformation of the evil doer", plays practically no part in determining between sentences to life imprisonment and death. In either case, the court must assume that, without a showing of good cause, the sentence it imposes will be carried out, and hence, the conception of rehabilitation for a future return to normal life is vain and meaningless.

The second of these elements, to effect retribution or revenge upon the culprit, has been universally rejected, as pointed out in the Ritter case, because it rests upon the foundation of an outmoded theory of vindictive justice. This thoroughly sound rejection has, we fear, frequently brought about the total ignoring of an additional element that we think should enter into the fixing of criminal punishment, and with which the element of retribution has too often been confused —a consideration of the nature and gravity of the injury the criminal has inflicted upon the victim of the crime, his family, and others who may have suffered thereby. That injury is as much a part of the whole picture of a crime, as are its other incidents and circumstances. In a large degree it is the measure of the enormity and extent of the offense, and without it a complete appraisal of the crime and the punishment merited would be impossible. The perpetrator of an aggravated assault and battery is more severely punished than one who commits a simple assault and battery. The embezzlement of $10 in one case and of a million in another are both embezzlements. Yet the courts do and should consider the gravity of the injury inflicted on the prosecutor in assessing the punishment to be imposed. This consideration properly plays a minor role in the fixing of penalties, and it should never reflect in the slightest degree a spirit of mere vengeance. The victims of crime, who are invited to appeal to the justice of organized society for protection and redress of their injuries, have a right to expect that they and their sufferings be not entirely ignored by the court in its more important work of protecting society generally and reforming the criminal. No one should be permitted to leave a court room after sentence in his case has been imposed with a burning resentment that the law and the sentencing authority were interested only in the welfare of the man who had griev-

ously wronged him, and cared nothing about his broken head, his stolen property, or his lost loved one. As we have already said, this consideration is one of the minor elements that enter into assessing punishment, but it is always present and should not be entirely overlooked. In considering our present problem, therefore, we have not ignored the snuffing out of a life that had scarcely begun, or forgotten the empty home, and the heartbroken parents of an innocent and decent child.

The third element that enters into the determination of the penalty, to restrain defendant physically and to make it impossible for him to commit further crimes, naturally plays a more important part in the solution of the problem. In a choice between death and life imprisonment, however, this does not assume the importance it does in other cases, in which the expiration of a sentence might result in turning loose upon the community a hardened and irreclaimable offender. While execution would be a complete solution of that problem, it is equally solvable, for all practicable purposes, by life imprisonment. It is folly to assert that the great Commonwealth of Pennsylvania is incapable of building prisons large and strong enough to keep murderers safely and permanently out of society. Thousands of hardened and vicious criminals are now being so kept, and our asylums are filled with homicidal maniacs, more dangerous than this defendant, against whom society is adequately protected.

There is one argument for the death penalty that is frequently advanced by laymen and even prosecuting attorneys, who are not burdened by the responsibility of making the decision that will doom a fellow man. This is that life sentences are generally shortened by pardons, and hence it is cynically contended that certain murderers should be executed, lest dangerous criminals be later turned loose upon the community

through the abuse of the pardoning power. The hollowness of this argument is manifest. We reject it as unworthy of serious consideration and have been careful not to let it enter into our deliberations. Baldly put, it runs thus: "Let us kill this man, who we think deserves only life imprisonment, for fear that at some future time he may for some reason become entitled to executive clemency. We are the only ones with true prophetic vision, we have no faith in the honesty and integrity of others, and now we will prevent them from exercising their lawful rights and powers by killing this man who does not deserve death." The viciousness of such an argument, however camouflaged, is obvious, for the appeal is purely to the emotions, and not at all to reason. It is the spawn of fear, the blood-brother of the impulse that drove this weakling to kill, and the father of injustice—unworthy of the notice of a man of heart and conscience.

The fourth and last objective of punishment laid down in the Ritter case is its exemplary feature, as a deterrent from similar violations of the law by others. Justice Stern well states this factor as a "theory which regards the penalty as being not an end in itself but the means of attaining an end, namely, the frightening of others who might be tempted to imitate the criminal. From this angle a penalty is a cautionary measure, aimed at the prevention of further crime in the community. There has been much controversy and an enormous amount of literature on the subject as to whether the death penalty does or does not act as a deterrent. . . . As before stated, the law of Pennsylvania retains the death penalty as an optional alternative. The real question is not as to whether the death penalty is in general a deterrent, but as to the particular kinds of murder cases in which execution would or would not be most likely to effect deterrence. It becomes a problem of determining the basis upon

which to make such classification." To which we would add the thought that both penalties are deterrents of murder, although the death penalty may probably be considered as the more powerful; just as the law looks upon it as the more severe. We do not believe, as contended by some, that the legislature intended to retain the death penalty as the principal method of punishing murderers, and to give the choice of life imprisonment as a second alternative in a limited number of cases. Nothing in the acts suggests such an intention, and if the two penalties are to be applied upon a preferential basis, we think the approach should be upon the assumption that life imprisonment is to be the first preferred penalty, and death be resorted to only in those cases in which all the facts and circumstances demand it. We gather that the same approach was in the mind of Justice Stern, when he said that death as the extreme penalty "should be aimed against cases where a murder is committed from what might be called a mental, rather than an emotional, impulse— in other words, where the murder is deliberately planned from a sordid motive or where the likelihood of its occurring is callously ignored by those who commit some other crime which may well give rise to it. Typical examples would be cases of highway robberies, burglaries and robberies committed by raids on banks, stores and the like, murders committed by poisoning or other means in order to collect life insurance or to attain some other mercenary end. . . . Where, however, a murder is committed under the impulse of some frenzy or strong passion . . . such a person is not likely to be deterred by the example of a death penalty imposed upon those who committed similar offenses. Such murders are not the result of reasoning or of weighing considerations for or against the intended crime, and, therefore, they are not apt to be repressed by the force of example." Judged by this standard, which we entirely approve, it is plain that the circum-

stances of the present murder place it in the category of killings meriting no more than life imprisonment. As we have already pointed out, while there was sufficient time between defendant's first impulse to kill and the commission of the deed to bring it within the legal classification of wilful, deliberate and premeditated murders, the killing presents an impulsive deed, motivated, as we believe, by the panic produced by fear of exposure, and contained no discernible element of a carefully planned and coldly executed crime. This works in defendant's favor.

Two other factors working strongly in his favor are also present in this case; namely, the psychopathic personality and the age of defendant. Had this crime been committed by a mature adult, there could have been but one choice, in our judgment, as to the proper penalty—death. It was committed, however, by a youth barely entering upon manhood, whose capacity for self control cannot be said to have finally matured. Shocking as the crime is when viewed in all its morbid details, it was still committed by a 17-year-old adolescent, who possesses an abnormal psychiatric character.

On this latter subject we have the advice of three noted psychiatric experts, who were appointed by the court, and who, in their professional learning, skill and judgment, are recognized as among the outstanding leaders in their special field. From their examination of defendant, coupled with all the records touching upon the history of his past behaviour and the particular facts of the case before us, he is, in their professional judgment, a "constitutional psychopathic inferior"; they tell us that this is not a form of insanity, and that in their opinion he was fully aware of what he was doing when he killed Simons, and appreciated the moral wrong involved in the act. They say that he suffers from a personality disorder which exhibits primarily subnormal inability or unwillingness to re-

sist the commission of wrongful or immoral acts. Such a person, also, is more emotionally unstable than the average man. When asked, however, whether it is not true that when the occasion arises, the constitutional psychopathic inferior, whom we will hereafter designate for convenience as a C. P. I., does not "simply become angry but passes directly into a state of rage", Doctor Strecker replied:

"No, I wouldn't want to say that. I will subscribe to your first statement that he has less emotional stability than the average person. Just how that emotional instability would be manifested would vary a great deal. I wouldn't say that you could actually say that it was marked by the fact that from mild anger you would pass into furious rage. I don't think that could be substantiated. It may be so, it may not."

Further questioned, Dr. Strecker said:

"Q. Isn't his reaction more likely to be violent than that of the average man?

"A. Actually never from the standpoint of anti-social behaviour. While these people commit a tremendous number of anti-social behaviour acts, they are usually not in the major category. They are misdemeanors and slight offenses against the law. We have a long history of them and they clutter up our courts and our prisons. They aren't distinguished by the fact that they commit major crimes any more than any other group of the population."

Again, "while able to distinguish between right and wrong behaviour, they are still not willing or able to exert inhibitions against anti-social behaviour as strong and effective as those which can be excited by the average person."

Taber's Cyclopedic Medical Dictionary defines a psychopathic as "One with a constitutional lack of moral sensibility, although possessing normal intelligence", and the psychopathic personality as "One who, though possessing normal intelligence, is or becomes, by rea-

son of heredity or congenital conditions, constitution-
ally lacking in moral sensibility, emotional control, and
the inhibition of will. . . . Psychopathics are attrac-
tive but cannot be depended upon. Judgment is poor;
they are easily pleased or displeased, and are above
the average in intelligence. Usually anti-social."

It will be noted from the foregoing that the C. P. I.
is essentially sane, that the psychiatrist places him in
that broad residual body of persons whose behaviour
pattern merely deviates in greater or less degree in
the matter of emotional reactions, moral appreciations,
and weakness of will from the normal. Considering
these as the cardinal characters of the so-called C. P. I.,
almost any person who is "unable or unwilling" to
conform to the normal standards of social behaviour
could be so classified. The degree of deviation from the
normal varies, of course, enormously. Among some it
is slight and scarcely discernible. Among others it
may be radical and profound, and verge upon the aber-
rations of lunacy. As a mere scientific term it is of
little help in describing the psychiatric personality of
this defendant. The evidence establishes that he was
generally recognized as a bully among other and espe-
cially younger children, that when very young he
seemed to take a mischievous delight in teasing and
physically annoying his classmates. This was not
always true, for in one of the schools he attended for
a time he is reported to have behaved himself credit-
ably. He is undoubtedly an egocentric and selfish per-
son. While he is of normal intelligence, his thoughts
dwell, as one of the psychiatrists said, in a world in
which he is the center of importance. His entire want
of veracity has already been noted. The only act of
real gravity that is known to have been committed by
him prior to the murder was when he, at a much
younger age, took another child under the stadium of
a nearby college, induced him to strip and struck him
several times with a belt. With respect to his weak-

ness of will upon which so much emphasis was laid by the psychiatrists, we have no doubt it was far from normal; but it was only a weakness. Strength of will to resist would have defeated his selfish desires, and in the pursuit of his own desires and pleasures he many times exhibited a strong and inflexible determination to accomplish them. Looking at this picture of defendant's history and personality as a whole, we do not hesitate to accept as correct the opinion of the experts, who classify him as a C. P. I., and hence an abnormal individual. But we think it significant that his personality pattern in its deviation from the normal, except in connection with this murder, is little, if any, at all greater than that of any individual of his age who has been indulged, petted and spoiled into being the "enfant terrible" of his neighborhood. In saying this we have no thought of belittling scientific classifications of individuals as C. P. I. It is of great value as a diagnostic aid to recognition of the true character of such persons before tragedy strikes, and as a guide in the proper training and correction of their character; but there is nothing in the present case which impresses us as so startling in the past history of this defendant as to lead us to look upon him as possessing a personality so subnormal as in itself to control the determination of the penalty to be here imposed. It is an important factor to bear in mind in conjunction with the other two factors we have already discussed, and to whatever extent his abnormal personality may be viewed as affecting penalty, it undoubtedly works in his favor.

As we have already pointed out, the atrocious character of this murder is mitigated only by the factors of youth, the sudden and impulsive character of the act, and his psychiatric status. For the first two reasons alone, we think, after a careful weighing of the rights and interests of society, on the one hand, and of defendant on the other, that justice requires us to

fix the penalty at life imprisonment. In doing so, we think it is our duty to express now the solemn warning that, if the time should ever arrive for others to review his case, they should beware lest they turn loose upon the community a sexual degenerate and a potential killer.

Accordingly, the proper orders will be entered, adjudging defendant, Seymour Levin, guilty of murder of the first degree and fixing the penalty at life imprisonment.